IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

NOEL A. CROWSON,                      )
                                      )
            Plaintiff,                )
                                      )
    v.                                )    Case No.
                                      )    09-4243-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Noel Crowson seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred in
(1) finding plaintiff not credible, and (2) failing to consider
the fact that plaintiff was awarded 50% service connected
disability by the Veteran's Administration. I find that the
substantial evidence in the record as a whole supports the ALJ's
finding that plaintiff is not disabled. Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.    BACKGROUND

On August 29, 2007, plaintiff applied for disability
benefits alleging that he had been disabled since April 1, 2007.
Plaintiff's disability stems from diabetes mellitus and carpal
tunnel syndrome. Plaintiff's application was denied on December

6, 2007.  On May 12, 2009, a hearing was held before an
Administrative Law Judge.  On June 2, 2009, the ALJ found that
plaintiff was not under a "disability" as defined in the Act.  On
September 29, 2009, the Appeals Council denied plaintiff's
request for review.  Therefore, the decision of the ALJ stands as
the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts

v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to
determine whether a claimant is disabled.  These regulations are
codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step
sequential evaluation process used by the Commissioner is
outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

           Yes = not disabled.
           No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits his ability
to do basic work activities?

           No = not disabled.
           Yes = go to next step.

    3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

           Yes = disabled.
           No = go to next step.

    4.   Does the impairment prevent the claimant from doing
past relevant work?

           No = not disabled.
           Yes = go to next step where burden shifts to Com-
missioner.

    5.   Does the impairment prevent the claimant from doing any
other work?

```
                    Yes = disabled.
                    No = not disabled.
```

## IV. *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Vincent Stock, in addition to documentary evidence admitted at the hearing.

### A. *SUMMARY OF TESTIMONY*

During the May 12, 2009, hearing, plaintiff testified; and Vincent Stock, a vocational expert, testified at the request of the ALJ.

### 1. **Plaintiff's testimony.**

At the time of the hearing plaintiff was 62 years of age (Tr. at 21). He has a Ph.D. in psychology (Tr. at 21). Plaintiff was living with his wife and 19-year-old son (Tr. at 21).

Plaintiff last worked in December 2006 (Tr. at 22). He owned Mid-Missouri Behavioral Center, a business he ran for about 12 years (Tr. at 22). After 2000 plaintiff withdrew $8,000 to $10,000 per year and therefore showed no earned income (Tr. at 22).

Plaintiff was diagnosed with diabetes in April 2003 (Tr. at 24-25). At the time of the hearing, he was using insulin and seven different pills per day for his diabetes (Tr. at 22). He began using the insulin a year before the hearing (Tr. at 23).

His blood sugar fluctuates from as high as 700 to as low as 150 (Tr. at 23). This causes concentration problems and fatigue (Tr. at 23). Plaintiff suffered from Agent Orange poisoning in Vietnam (Tr. at 23). He has neuropathy in both legs, an arm, and a wrist (Tr. at 23). He has to take a nap every afternoon and he has trouble staying on task (Tr. at 23). He also some has some trouble with short-term memory (Tr. at 23).

When asked why, in November 2008, plaintiff's doctor reported that he was ambulating without difficulty, doing well, and feeling well, plaintiff said he could not explain why his doctor would have written that (Tr. at 24).

At the time of the hearing, plaintiff weighed approximately 235 pounds (Tr. at 24). He testified that he could walk a few hundred yards at the most, he could stand for an hour at a time, sit for an hour and a half before needing to stand up (Tr. at 25-26). He has no problem with lifting (Tr. at 26). Despite this testimony when the ALJ questioned him, plaintiff testified later in the hearing that he could stand to wash dishes for a maximum of 15 to 20 minutes and that he could sit for a maximum of an hour (Tr. at 31).

Plaintiff spends his day writing, using the computer (although he cannot keyboard with his right wrist for very long), doing some light housekeeping, talking on the phone, checking the

mail (Tr. at 26). Plaintiff's wife works (Tr. at 27). Up until

a year before the hearing, plaintiff did all the "high school

stuff" with his son, but now his son is in the military (Tr. at

27). Plaintiff can prepare sandwiches; drive; and go shopping

although he often sits while his wife shops because walking on

the concrete floors is tiring for him (Tr. at 27).

Plaintiff was asked whether his medications help him (Tr. at

28). He said:

> Well they have to continue to strengthen them. I think --
> I'm not being overly exaggerated when I say Agent Orange is
> killing tens of thousands of American veterans every day and
> it's going to kill me. Eventually it will kill me. It's
> either going to cause me to have kidney failure, heart
> attack, something. So it's a constant issue of continuing
> to increase the medication, increase the insulin to keep it
> under control and at some point it will not be under control
> because it's not diabetes that's caused by normal, you know,
> diabetic issues, it's actually a poisoning and it kills the
> organs in your body.

(Tr. at 28).

When plaintiff was counseling people, since January 2007, he

may be able to concentrate for an hour and other times could

hardly concentrate at all due to the fluctuation of his blood

sugar (Tr. at 28-29). There were one or two times every day when

plaintiff was unable to concentrate at all due to blood sugar

spikes (Tr. at 29). Plaintiff's doctors have recommended that he

lie down and rest when he has blood sugar spikes (Tr. at 30).

When plaintiff gets high blood sugar, he gets dizzy and then he

gets a severe headache (Tr. at 30). Sometimes he gets blurry

vision (Tr. at 30). He experiences these symptoms every day for

as little as five minutes to as much as a half hour (Tr. at 30).

Side effects of his medication consist of occasional diarrhea,

upset stomach, inability to sleep a little bit (Tr. at 28).

Plaintiff has no problems with his eyes so far (Tr. at 28). When

asked why he decided, in December 2006, to close his business,

plaintiff said:

> The issue really I'm a person who believes if you're going
> to work you should be able to give the person that in my
> business should be able to give them 100 percent of your
> time and I found myself more and more often in the year
> preceding that not being aware of what the person on the
> other side of the desk was talking to me about and I find
> myself sort of -- I'm not going to say spaced out, but the
> headaches and the fatigue were causing me not to be able to
> concentrate on what they were saying and more and more often
> when people would come in and they come in for a second or
> third or fourth session and I was dealing with them or
> insurance companies or whoever I was dealing with I'd find
> that I had forgotten some of the conversation or couldn't
> remember what we were talking about and in my mind that
> could have led to an issue of malpractice or worse in my
> case what I thought was that I wasn't being responsible for
> the person I was having to work with so I just thought, you
> know, I just can't do this anymore.

(Tr. at 31-21).

Plaintiff suffers from carpal tunnel syndrom in his right

wrist (Tr. at 30).

**2. Vocational expert testimony.**

Vocational expert Vincent Stock testified at the request of

the Administrative Law Judge. The first hypothetical involved a

8

person limited to medium exertion work; who could frequently stoop, kneel, crouch, crawl, use gross manipulation, handle (frequently but not constantly); occasionally balance and climb stairs and ramps; never climb ropes, ladders or scaffolds; must work in a temperature controlled environment; and should avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery (Tr. at 33-34). The vocational expert testified that such a person could perform plaintiff's past relevant work a counselor or executive director (Tr. at 33-34).

The second hypothetical involved a person limited to light work; could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps; could never climb ropes, ladders or scaffolds; must work in a temperature controlled environment; and should avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery (Tr. at 34). The vocational expert testified that such a person could perform plaintiff's past relevant work as a counselor or an executive director (Tr. at 34).

The third hypothetical was the same as the second except the person was limited to sedentary work (Tr. at 34). The vocational expert testified that the person could still perform those two jobs (Tr. at 34).

The fourth hypothetical was the same as the third except the person would be limited to performing only simple tasks secondary to distractions from pain and the affects of medication and an inability to focus and concentrate for extended periods of time (Tr. at 34).  The vocational expert testified that the person could not perform plaintiff's past relevant work (Tr. at 34).

**B.    *SUMMARY OF MEDICAL RECORDS***

On March 24, 2006, plaintiff called the VA Hospital requesting refills on his medications (Tr. at 188).  "Pt. has not been seen in clinic since 8/04.  Pt must be seen within 60 days for further refills.  Dr. Mank has refilled for 30 days only. Labs prior to appt. or at appt if can't make 2 trips. . . .  Pt had called in Dec.  We filled meds with the understanding pt would come in for dr. appt. Pt no showed 12/21."

On April 11, 2006, plaintiff was seen at the VA Hospital for a follow up (Tr. at 184-188).  "Patient has been noncompliant with f/u but is here today.  He is taking glyburide 10 mg q am [every morning] and 5 mg q pm [every evening] and metformin 1000 mg qd [every day], rather than as rxed [prescribed] above.  His sugars continue high.  He has gained weight and has been off thyroid med for 2 years and did not f/u with testing on this issue till now. . . .  He states he has glucometer at home and test[s] sometimes."  Plaintiff's weight was 250 pounds, his blood

sugar was 141, and his A1c[1] was 8.0%.  He had a diabetic foot

exam and both his feet were normal.  The doctor encouraged

exercise, diet restraint, appropriate diet, and regular blood

sugar testing.

On July 31, 2006, plaintiff was seen at the VA Hospital for

a follow up on "chronic medical issues" (Tr. at 181-183).

Plaintiff had been missing his evening diabetes medication about

50% of the time.  His blood sugar readings had been in the low

---

[1]Blood sugar sticks to proteins in the blood.  The red blood
cells that circulate in the body live for about three months
before they die.  When sugar sticks to these cells, it gives
doctors an idea of how much sugar has been around for the
preceding three months.  In most labs, the normal range is 4-
5.9%. In poorly controlled diabetes, it is 8.0% or above, and in
well-controlled patients it is less than 7.0%.  Measuring A1c
gives a more reasonable view of what has happened over the course
of time (3 months), and the value does not bounce as much as
finger-stick blood sugar measurements.  There is a correlation
between A1c levels and average blood sugar levels.  The A1c test
is used as a standard tool to determine blood sugar control in
patients known to have diabetes.

| A1c (%) | Mean blood sugar (mg/dl) |
|---------|--------------------------|
| 6       | 135                      |
| 7       | 170                      |
| 8       | 205                      |
| 9       | 240                      |
| 10      | 275                      |
| 11      | 310                      |
| 12      | 345                      |

http://www.medicinenet.com/hemoglobin_a1c_test/article.htm;

100s to 200. "He feels a little sluggish." Plaintiff was 251
pounds. His blood sugar was 195 and his A1c was 8.5%. He was
told to work on compliance with medication. "Encourage[d]
exercise, diet restraint, appropriate diet and regular BS [blood
sugar] testing."

On September 15, 2006, plaintiff was seen at the VA Hospital
(Tr. at 169-173). The record reads in part as follows:

> PAST MEDICAL HISTORY: This veteran was diagnosed with
> diabetes Type 2 in 2003. He denies any ketoacidosis[2] or
> hypoglycemic [low blood sugar] reactions, and has never been
> hospitalized for the same. He is on a restricted diet;
> however, his weight has remained steady at 251.1 pounds
> since his last examination. He has no restriction in
> activity on account of diabetes that require him to avoid
> strenuous activity to prevent hypoglycemic reactions. The
> veteran uses metformin HCL 1000 mg twice daily for diabetes,
> as well as glyburide 10 mg twice daily. His diabetes is not
> currently very well controlled, but is improving somewhat. .
> . . The veteran does not have a history of retinopathy[3] and
> his last examination was within the last year. . . .
> Neurologically, he does have some mild tingling and numbness
> in the forefoot, however has never been given any medication
> for the same, as this is a relatively new development. The
> veteran does wear bilateral cowboy boots and states that
> this is his shoe wear of choice. He has never been advised
> to wear any type of footwear. He denies lethargy, weakness,
> anorexia, denies urinary frequency during the day while his
> sugars are as controlled as they are at this time, and
> denies incontinence. . . .

---

[2]Diabetic ketoacidosis is a complication of diabetes that
occurs when the body cannot use sugar (glucose) as a fuel source
because the body has no insulin or not enough insulin, and fat is
used instead. Byproducts of fat breakdown, called ketones, build
up in the body at poisonous levels.

[3]Diabetic retinopathy is a complication of diabetes that
results from damage to the blood vessels of the light-sensitive
tissue at the back of the eye (retina).

*  *  *  *  *

DIAGNOSES:  1.  Diabetes mellitus Type 2, diagnosed 2003.
2.  No current evidence of diabetic nephropathy [kidney
damage].  3.  Early peripheral neuropathy[4] of the distal
forefoot in the bilateral lower extremities with mild
diminished sensation to pin prick. . . .

Plaintiff's glucose was 148 with normal listed as 72 to 99

(Tr. at 172).  His Hemoglobin A1c was 8.0, indicating an average

glucose level over the past three months of 180 (Tr. at 173).

On October 30, 2006, plaintiff was seen at the VA Hospital

for an eye exam (Tr. at 179-180, 194).  His Hemoglobin A1c

results were reviewed and listed as follows:

10/30/06  7.8

09/15/06  8.0

07/17/06  8.5

03/29/06  8.0

12/05/05  8.7

08/12/04  8.1

03/09/04 14.2[5]

Plaintiff was assessed with non-insulin dependent diabetes

mellitus without retinopathy (damage to the retina).  Plaintiff

---

[4]Peripheral neuropathy is a problem with the nerves that
carry information to and from the brain and spinal cord.  This
can produce pain, loss of sensation, and an inability to control
muscles.

[5]7.0 indicates an average blood sugar level of 150.  8.0
indicates an average blood sugar level of 180.  14.0 indicates an
average blood sugar level of 360.

was advised to accomplish good blood sugar control.

April 1, 2007, is plaintiff's alleged onset date.

On July 12, 2007, plaintiff went to the VA Hospital to have blood drawn for lab work (Tr. at 174-175). He said he had stopped taking Rosiglitazone about six weeks earlier because of warnings he had heard indicating that the drug could cause heart attacks.

On July 13, 2007, C.A. Houf, a nurse with the VA Hospital, called plaintiff to give him the results of his lab work (Tr. at 174). The nurse spoke with plaintiff's wife. She was told that plaintiff's A1c was elevated and was asked if he was taking his Metformin. Plaintiff's wife was not sure and said she was ask him and have him call back. Mrs. Crowson was told that plaintiff needed to start back on the Metformin if he had not been taking it, and she was informed that the doctor recommended plaintiff start on insulin if he had been taking the Metformin. Plaintiff did not call back. A letter was sent to him with this information.

On July 23, 2007, plaintiff called the VA Hospital about the letter that had been mailed to him ten days earlier with his lab results (Tr. at 175). Plaintiff said he had been taking Metformin but only one per day. He said he started back on two per day but he was not taking his Rosiglitazone due to an

increased risk of heart attack.  Dr. Mank told plaintiff to take
his Glyburide 10 mg twice a day and Metformin 1000 mg twice a day
as he had been directed.  He needed to have his lab work
rechecked in October.

On August 29, 2007, plaintiff telephoned the VA Hospital
complaining of severe headaches for the past two to three weeks
as well as tingling in his shoulders and toes (Tr. at 173-174).
He said he had been checking his blood sugars three times a day
and had been taking an extra dose of Metformin at noon for the
past two days.  He said he had been following his diet. His
lowest blood sugar reading in the past two weeks had been 265 and
the highest was that day at 420.  Plaintiff gave his office
number as a call back number.  Dr. Jerome Mank instructed his
nurse to call plaintiff and inform him that he should not exceed
2,500 mg of Metformin daily.  "He can take metformin 1000 mg q am
[every morning], 500 mg q noon [every day at noon], 1000 mg q pm
[every evening].  If that [is] not effective, option is to
restart rosiglitazone (which he stopped because of press reports
regarding concerns for Heart Attack) or start on NPH insulin at
bedtime.  He can try Tylenol or ibuprofen for HA [headache].  If
he feels things are not coming around, he will need appointment
for evaluation with me."

December 31, 2007, is plaintiff's last insured date.

On January 31, 2008, plaintiff was seen by Dr. Mank at the VA Hospital (Tr. at 204-206). He reported that his blood sugar had been running around 195 which Dr. Mank found consistent with plaintiff's recent A1c. Plaintiff reported more polyuria[6] but no dysuria[7] or hematuria.[8] He denied chest pain, shortness of breath, palpitations, leg swelling, or heart history. On exam Dr. Mank found that plaintiff's memory was intact to recent and distant events. He ambulated without difficulty. His muscle strength was 5/5 bilaterally and he had equal handgrips, no atrophy. That day his blood sugar was 200 and his A1c was 8.9%. "He will work on compliance with meds, diet and weight loss. Continue on metformin 1000 mg bid [twice a day], glyburide 10 mg bid, 81 mg ECASA[9] qd [every day], start actos[10] 15 mg daily. Start checking BS [blood sugar] daily."

On March 14, 2008, plaintiff was seen by Ahmad Hooshmand, M.D., a neurologist (Tr. at 208-210). Dr. Hooshmand's record reads in part as follows:

> . . . [Plaintiff] was evaluated in my office on one occasion on 13th of March 2008 due to tingling of his hands.

---

[6]Excessive passage of urine (at least 2.5 liters per day).

[7]Painful urination.

[8]Blood in the urine.

[9]Non-steroidal anti-inflammatory.

[10]Treats diabetes.

This is more severe in right side. That discomfort in some occasion wakes him up at night. He also complains of weakness of his grip. Patient denies any history of trauma.

PAST MEDICAL HISTORY: He has history of diabetes mellitus for about 3 years. He underwent workup at VA hospital and they diagnosed he has peripheral neuropathy. . . .

SOCIAL HISTORY: Patient is married and he is retired from Army. He worked in that system for 37 years. . . . He doesn't smoke cigarettes and doesn't drink alcohol. He has a PhD in psychology. . . .

Genitourinary review of system doesn't show history of urgency or frequency. . . .

PHYSICAL EXAMINATION: . . . Wt is 250 lbs and his HT is 71". . . . Mental status is grossly normal. . . . He is able to see with either eye and visual field is full by confrontation method. . . . Evaluation of motor power shows normal strength of both arms and both legs. . . . Patient had NCV [nerve conduction velocity testing] of both motor median and both motor ulnar nerves . . . [and] EMG of cervical muscles and both upper extremities. . . .

IMPRESSION: The above-mentioned data are compatible with mild right carpal tunnel syndrome. Patient may use vitamin B6 50 mg twice a day and avoid repetitive hand movement like pulling weeds or typing data processing. He may use splint at night to protect his median nerve during sleep. Control of his diabetes mellitus is of prime consideration. . . .

On April 14, 2008, plaintiff was seen by Dr. Mank at the VA Hospital (Tr. at 213-216). Plaintiff weighed 250 pounds. He said he was having "zero" pain. On exam, plaintiff's memory was intact to recent and distant events, his gait was steady, he had full active range of motion, he was able to ambulate without difficulty, his muscle strength was 5/5 bilaterally, he had equal handgrips and no atrophy. Plaintiff's blood sugar was 241; his

A1c was 10.7%.  "Discussed how important weight loss is to controlling DM [diabetes mellitus].  Again discussed importance of compliance with meds, diet and weight loss and exercise. . . .  Increase metformin to 850 mg tid [three times a day]."

On April 22, 2008, plaintiff was evaluated by Myo Lwin, M.D., a staff physician at the VA Hospital for a "compensation and pension examination" (Tr. at 217-230).  Dr. Lwin wrote that plaintiff is not restricted from strenuous activities (Tr. at 218), that the symptom of diabetic related peripheral vascular disease in his legs was "coldness", that he suffered from diminished vision but no retinopathy.  The notes state that plaintiff's symptoms of peripheral neuropathy related to diabetes were "Paresthesias, loss of sensation, pain, gait abnormality"; however, this is listed as a restatement of plaintiff's subjective complaints under the "medical history" section of the form.  Plaintiff weighed 250 pounds.  After a neurological exam, Dr. Lwin found that plaintiff had normal coordination, normal orientation, and normal memory (Tr. at 220).  His A1c was 10.7%, meaning his blood sugar had been averaging around 260 for the past few months.  His blood sugar that day was 241, his cholesterol was 251 (with normal being 200 or below), and his triglycerides were 514 (with normal being under 150).  Dr. Lwin found no visual impairment.  Plaintiff had 5/5 muscle strength on

both upper and lower extremities except diminished range of motion in his big toes.  He had good hand grip strength bilaterally and no tenderness on his wrists.  His gait and balance were normal.  Dr. Lwin diagnosed peripheral neuropathy[11] of bilateral lower extremities, and right carpal tunnel syndrome. Dr. Lwin indicated that plaintiff had no limitations on "chores", only mild limitations on exercise, no limitations on recreation or personal care.  He noted that holding a steering wheel was difficult for plaintiff because of numbness in his hands.

On August 15, 2008, plaintiff was seen at the VA Hospital for a follow up (Tr. at 243-246).  Plaintiff said he had been checking his blood sugar in the evening about two to three hours after a meal and they were ranging from 200 to 250.  "He is walking some."  Plaintiff's weight was 253.6 pounds.  He described his pain as "zero."  On exam the doctor found plaintiff's memory to be intact to recent and distant events.  He was able to ambulate without difficulty.  His blood sugar was

---

[11]"Peripheral neuropathy often causes numbness and pain in your hands and feet. People typically describe the pain of peripheral neuropathy as tingling or burning, while they may compare the loss of sensation to the feeling of wearing a thin stocking or glove.  Peripheral neuropathy is caused by nerve damage. It can result from such problems as traumatic injuries, infections, metabolic problems and exposure to toxins. One of the most common causes is diabetes. In many cases, peripheral neuropathy symptoms improve with time — especially if it's caused by an underlying condition that can be treated." http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131

162; his A1c was 7.6%. "A1c much better at 7.6, Discussed how important weight loss, diet and exercise [are]."

On September 11, 2008, plaintiff was seen at the VA Hospital for a cardiology consult (Tr. at 240-242). His weight was 251 pounds, and he described having "zero" pain. Plaintiff's blood sugar was 162. Plaintiff said he had been experiencing chest pain off and on which started six months earlier. Aspirin relieved the pain. His exam was normal except mild diastolic dysfunction. Plaintiff was encouraged to start a baby aspirin every day.

On November 17, 2008, plaintiff was seen by Dr. Mank at the VA Hospital for a follow up on diabetes (Tr. at 248-250). "Patient is doing well. . . . He feels well." Dr. Mank noted that plaintiff's recent cardiac workup was within normal limits. Plaintiff's blood sugar was still running 150 and over. He said he was willing to start on insulin. Plaintiff's weight was 253.5 pounds; he described "zero" pain. His memory was intact to recent and distant events; he was able to ambulate without difficulty. His blood sugar that day was 162, and his A1c was 7.8%. "A1c much better at 7.8. Discussed how important weight loss, diet and exercise [are]." Plaintiff was started on insulin.

On February 12, 2009, plaintiff had an ophthalmic examination (Tr. at 252-255).  Plaintiff said he did not need glasses, but that he was seeing two images/shadows.  With glasses plaintiff had 20/20 vision in both eyes.  "No retinopathy noted." Plaintiff was assessed with intermittent diplopia (double vision).  He was advised to work at better control of his blood sugar.

## C.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1964 through 2003:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1964 | $      30.20 | 1984 | $ 27,827.72 |
| 1965 | 493.55 | 1985 | 33,009.30 |
| 1966 | 1,483.60 | 1986 | 21,915.25 |
| 1967 | 2,527.45 | 1987 | 18,688.09 |
| 1968 | 2,925.32 | 1988 | 26,914.12 |
| 1969 | 2,776.91 | 1989 | 37,167.67 |
| 1970 | 4,440.00 | 1990 | 31,321.40 |
| 1971 | 4,616.00 | 1991 | 34,910.85 |
| 1972 | 3,270.83 | 1992 | 32,262.11 |
| 1973 | 720.64 | 1993 | 30,471.24 |
| 1974 | 259.05 | 1994 | 32,563.74 |
| 1975 | 301.35 | 1995 | 30,257.06 |

| 1976 | 5,735.87 | 1996 | 23,591.39 |
|------|----------|------|-----------|
| 1977 | 10,289.55 | 1997 | 11,001.82 |
| 1978 | 10,976.10 | 1998 | 10,554.96 |
| 1979 | 13,148.06 | 1999 | 6,818.16 |
| 1980 | 14,949.25 | 2000 | 10,705.03 |
| 1981 | 19,525.16 | 2001 | 13,718.58 |
| 1982 | 24,449.71 | 2002 | 6,889.08 |
| 1983 | 26,418.19 | 2003 | 556.00 |

(Tr. at 91, 101).

Plaintiff had no reported income from 2004 through 2009 (Tr. at 93).

**Records from the Department of Veterans Affairs**

On December 7, 2006, the Department of Veterans Affairs informed plaintiff of its decision on his claim for service connected compensation (Tr. at 160-162):

<u>DECISION</u>

1.   Service connection for erectile dysfunction is granted with an evaluation of 0 percent effective August 10, 2006.

2.   Entitlement to special monthly compensation based on loss of use of a creative organ is granted from August 10, 2006.

3.   Service connection for left lower extremity peripheral neuropathy is granted with an evaluation of 10 percent effective August 10, 2006.

* * * * *

Your monthly entitlement amount is [$686.00].

* * * * *

| Medical Description | Percent (%) Assigned | Effective Date |
|---|---|---|
| erectile dysfunction | 0% | Aug 10, 2006 |
| left lower extremity peripheral neuropathy | 10% | Aug 10, 2006 |
| right lower extremity peripheral neuropathy | 10% | Aug 10, 2006 |

We determined that the following service connected condition(s) hasn't/haven't changed:

| Medical Description | Percent (%) Assigned |
|---|---|
| diabetes mellitus | 20% |

We granted entitlement to special monthly compensation based on loss of use [of] creative organ from August 10, 2006.

Your overall or combined rating is 40%. We do not add the individual percentages of each condition to determine your combined rating. We use a combined rating table that considers the effect from the most serious to the least serious conditions.

(Tr. at 160-162).

**Department of Veterans Affairs Rating Decision**

The Department of Veterans Affairs Rating Decision dated May 1, 2008, reads in pertinent part as follows:

INTRODUCTION

The records reflect that you are a veteran of the Vietnam Era and Peacetime. You served in the Army from July 26, 1965 to July 25, 1968 and from September 5, 1986 to February 15, 1987. You filed a new claim for benefits that was received on October 22, 2007. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

23

<u>DECISION</u>

1.  Service connection for right carpal tunnel syndrome is granted with an evaluation of 10 percent effective October 22, 2007.

2.  Evaluation of diabetes mellitus, which is currently 20 percent disabling, is continued.

3.  Evaluation of right lower extremity peripheral neuropathy, which is currently 10 percent disabling, is continued.

4.  Evaluation of left lower extremity peripheral neuropathy, which is currently 10 percent disabling, is continued.

5.  Service connection for left upper extremity peripheral neuropathy is denied.

<u>EVIDENCE</u>

- Service Treatment Records from July 26, 1965 through February 15, 1987

- Statement dated February 4, 2008

- Statement, Mary Ann Crowson, dated February 4, 2008

- VA Treatment Records, VAMC Columbia, from January 11, 2007 through November 8, 2007

- Report, Ahmad Hooshmand MD, dated March 14, 2008

- VA Examination, VAMC Columbia, dated April 22, 2008

<u>REASONS FOR DECISION</u>

<u>1.  Service connection for right carpal tunnel syndrome as secondary to the service-connected disability of diabetes mellitus.</u>

Service connection for right carpal tunnel syndrome has been established as related to the service-connected disability of diabetes mellitus.  An evaluation of 10 percent is assigned from October 22, 2007.

24

Service connection is warranted because the VA examiner provided a positive medical opinion relating your current right carpal tunnel syndrome shown on EMG testing by Dr. Hooshmand to your service-connected diabetes.

An evaluation of 10 percent is assigned based on VA examination showing decreased sensation to vibration and light touch that more closely approximates incomplete paralysis of hand movements which is mild.  A higher evaluation of 30 percent is not warranted unless there is incomplete paralysis of hand movements which is moderate.

The effective date for the grant of benefits is the date we received your claim.

2.  Evaluation of diabetes mellitus currently evaluated as 20 percent disabling.

The evaluation of diabetes mellitus is continued as 20 percent disabling.

An evaluation of 20 percent is assigned based on VA examination showing there is a requirement for oral hypoglycemic agents and restricted diet, with no restriction on your activity.  A higher evaluation of 40 percent is not warranted unless insulin, restricted diet, and regulation of activities are required.  Regulation of activities means avoidance of strenuous occupational and recreational activities to help regulate blood sugar levels.

3.  Evaluation of right lower extremity peripheral neuropathy currently evaluated as 10 percent disabling.

The evaluation of right lower extremity peripheral neuropathy is continued as 10 percent disabling.

An evaluation of 10 percent is assigned based on VA examination showing decreased sensation to vibration and light touch that more closely approximates incomplete paralysis below the knee which is mild.  A higher evaluation of 20 percent is not warranted unless there is evidence of incomplete paralysis below the knee which is moderate.

This disability is not specifically listed in the rating schedule; therefore, it is rated analogous to a disability

in which not only the functions affected, but anatomical localization and symptoms, are closely related.

4.  Evaluation of left lower extremity peripheral neuropathy currently evaluated as 10 percent disabling.

The evaluation of left lower extremity peripheral neuropathy is continued as 10 percent disabling.

An evaluation of 10 percent is assigned based on VA examination showing decreased sensation to vibration and light touch that more closely approximates incomplete paralysis below the knee which is mild.  A higher evaluation of 20 percent is not warranted unless there is evidence of incomplete paralysis below the knee which is moderate.

This disability is not specifically listed in the rating schedule; therefore, it is rated analogous to a disability in which not only the functions affected, but anatomical localization and symptoms, are closely related.

5.  Service connection for left upper extremity peripheral neuropathy as secondary to the service-connected disability of diabetes mellitus.

Service connection may be granted for a disease or injury which resulted from a service-connected disability or was aggravated thereby.

Neither service treatment records nor VA treatment records show complaints, diagnosis, or treatment for left upper extremity peripheral neuropathy.  EMG testing by Dr. Kooshmand [sic] did not result in diagnosis of left upper extremity peripheral neuropathy.  VA examination also did not show diagnosis of left upper extremity peripheral neuropathy.

The evidence does not show that left upper extremity peripheral neuropathy is related to the service-connected condition of diabetes mellitus, nor is there any evidence of this disability during military service.

REFERENCES:
Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to

all veteran benefits.  For additional information regarding
applicable laws and regulations, please consult your local
library, or visit us at our web site, www.va.gov.

(Tr. at 232-235).

**Department of the Army Approval Letter (Reconsideration)**

On July 21, 2008, a letter was written to plaintiff from the

Department of the Army indicating that plaintiff's request for

reconsideration had been granted and his payment for combat-

related special compensation had been adjusted as follows:

| | |
|---|---|
| Diabetes | 20% |
| Erectile Dysfunction | 0% |
| Impaired hearing | 0% |
| Paralysis of median nerve right wrist | 10% |
| Paralysis of sciatic nerve right foot | 10% |
| Paralysis of sciatic nerve left foot | 10% |
| Tinnitus [ringing in ears] | 10% |

The letter gave a total combat related disability of 50% and

included the following:  "Our goal is to award you the maximum

CRSC [combat-related special compensation] allowable by law."

(Tr. at 237-238).

*V.*    *FINDINGS OF THE ALJ*

Administrative Law Judge Michael Mance entered his opinion

on June 2, 2009 (Tr. at 9-16, 105-111).

Step one.  The ALJ found that plaintiff had not engaged in

substantial gainful activity during the period from his alleged

27

onset date of April 1, 2007, through his last insured date of December 31, 2007 (Tr. at 11).

Step two. The ALJ found that plaintiff suffers from the following severe impairments: diabetes mellitus with diabetic neuropathy and carpal tunnel syndrome in the right upper extremity (Tr. at 11).

Step three. The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11).

Step four. The ALJ analyzed plaintiff's credibility and found that plaintiff's statements were not entirely credible (Tr. at 13-15). He then found that plaintiff retained the residual functional capacity to lift "20 pounds and 10 pounds occasionally";[12] stand or walk six hours out of an eight-hour work day; sit six hours out of an eight-hour work day; could not climb ropes, ladders, and/or scaffolds; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could frequently handle objects with his right hand; must avoid concentrated exposure to industrial hazards, unprotected heights, and vibration; and must work in a temperature-controlled environment (Tr. at 12). With this residual functional capacity, plaintiff could return to his past relevant work as a director

_____

[12]I assume the ALJ meant 20 pounds occasionally and ten pounds frequently (Tr. at 12).

(Tr. at 15).  Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.  Specifically plaintiff states that the ALJ should have found credible plaintiff's allegation that he is unable to concentrate for more than an hour at a time during the day and that he must rest during the regular work day because of fatigue.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting

plaintiff's subjective complaints of disability are as follows:

> Although the claimant was diagnosed with Type II diabetes in
> 2003, his records do not indicate significant and ongoing
> treatment for his impairments until 2006. On April 11,
> 2006, he was not compliant with his medications. Despite
> this lack of compliance, his examiner noted he was not in
> any acute distress and ambulated without difficulty.

> The claimant returned to the Veteran's Administration
> Medical Center on July 31, 2006. At that time, he reported
> he felt sluggish. It was indicated he was once more non-
> compliant with his medications and only took his evening
> medications for his diabetes half the time. This lack of
> compliance seems inconsistent with an effort by the claimant
> to improve his symptoms and allow him to return to work.
> Such inconsistency undermines the claimant's allegations of
> disability.

> The claimant's records from a visit to the Veteran's
> Administration Medical Center on September 15, 2006,
> indicated he was taking Metformin and Glyburide. His
> diabetes was not very well controlled at the time, but
> according to the records it was improving. The records
> indicate the claimant could walk on his toes and heels and
> perform modified squatting. His grip strength was full at
> 5/5, his foot push/pull strength was full at 5/5, and he had
> intact reflexes. He had no history of retinopathy and only
> mild tingling in his foot. He did not have pedal edema.
> The claimant was also taking Levothyroxine sodium for his
> hypothyroidism.

> The claimant's trace neuropathy has not resulted in
> significant limitations of functioning. On January 31,
> 2008, his treating physician at the Veteran's Administration
> Medical Center, Jerome Mank, M.D., stated his blood sugar
> level was within normal limits at 195. According to Dr.
> Mank, the claimant was in no apparent distress. His muscle
> strength was full at 5/5, and he had equal hand grip
> strength without atrophy or tremors. The claimant ambulated
> without difficulty and had an intact memory, according to
> his examining physician. These observations seem to
> contradict the standing and walking limitations that the
> claimant testified he now faces.

The claimant had a consultative examination with Ahmad Hooshmand, M.D., on March 13, 2008. At this examination the claimant complained of weak grip and tingling in his hands. Dr. Hooshmand stated that claimant had an EMG that was compatible with mild carpal tunnel syndrome in the right hand. Dr. Hooshmand examined the claimant and noted no pitting edema or muscle atrophy in his extremities. The claimant had normal . . . leg strength and normal coordination.

The more recent records from the Veteran's Administration Medical Center do not support that the claimant's impairments result in significant strength limitations or significant sensation limitations. The records from April of 2008 indicate the claimant has full, 5/5, lower extremity muscle strength and ambulates without difficulty. His grip strength was full at 5/5 bilaterally and he had no atrophy or tremors. When examined on April 22, 2008, the claimant had no diabetic shin abnormalities, though he had diminished dorsiflexion in both of his big toes and decreased vibratory and touch sensation in his hands. Although the claimant was not diagnosed with carpal tunnel syndrome until 2008, it is assumed he had some symptoms related to this impairment in 2007.

The record indicates the claimant is obese. The record contains no persuasive evidence that the claimant's obesity is accompanied by significant degenerative joint disease or degenerative disc disease. There is no persuasive evidence the claimant's obesity has caused reduced respiratory capacity, skin disorders, edema, huge calluses on his feet or coronary artery disease. The claimant's treating physician has not reported that his obesity results in severe symptoms and limitations of function, for 12 consecutive months in duration, despite compliance with treatment. I have considered the effect of obesity on the claimant's combination of impairments.

The claimant visited Dr. Mank in the fall of 2008. He was encouraged to lose weight. He was still able to ambulate without difficulty and his blood sugar was within normal limits at 150. He reported he felt well and was willing to start using insulin. On February 12, 2009, he received instruction on how to use insulin.

The records note the claimant has minimal limitations to his
vision.  This was diagnosed as a trace cataract that on
October 30, 2006, was deemed not the result of diabetic
neuropathy.

The claimant has diabetes.  The claimant was not fully
compliant with his medications until 2006.  Despite this,
the medical record does not document that the claimant had
ongoing complications relating to his diabetes through his
date last insured.  He did not have recurrent diabetic
ketoacidosis or any history of diabetic coma.  He did not
have complications such as significant weight loss, deep
ulcers, end-organ damage, cerebral vascular disease,
coronary artery disease, congestive heart failure,
significant neuropathy, nephropathy, significant retinopathy
or peripheral vascular disease.  The lack of such symptoms
undermine[s] the claimant's allegations that his diabetes
results in significant symptoms that were disabling as of
his date last insured.

As of the date last insured of December 31, 2007, nothing
from the medical records indicated that the claimant's
combination impairments was severe enough to preclude him
from performing all work available in the national economy.
The claimant did not regularly receive treatment for his
impairments until 2008.  The medical records did not
document that any treating physician has ever found or
imposed any long-term, significant, and adverse physical
limitations on the claimant's functional capacity as a
result of his impairments.

After careful consideration of the evidence, I find that the
claimant's medically determinable impairments could
reasonably be expected to cause some of the alleged
symptoms; however, the claimant's statements, including his
testimony, concerning the intensity, persistence, and
limiting effects of these symptoms were not supported by the
medical records as of his date last insured and were only
credible to the extent they were consistent with the above
residual functional capacity assessment.

(Tr. at 13-15).

Contrary to plaintiff's argument, the record establishes

that plaintiff did not have difficulty concentrating as he

alleges and that his doctors not only did not recommend rest, they recommended exercise.

In making his argument, plaintiff first points out that the ALJ did not mention plaintiff's work history "which would certainly support his credibility." I disagree. Plaintiff has a doctorate degree and worked as the director of his own business. During his 30-year earnings history, plaintiff earned $25,000[13] or more in only 11 years. His highest level of earnings occurred in 1989 -- 18 years before he allegedly became disabled. During 1989 plaintiff earned $37,167.67 -- approximately $17.87 per hour for full-time work. For approximately 4 1/2 years before his alleged onset date, plaintiff had no reported earnings.[14] During his last ten years of reported earnings, plaintiff's earnings consistently dropped; and he earned only $556 during 2003, four years prior to his alleged onset date of April 1, 2007. During 1997 -- ten years before he allegedly became disabled -- plaintiff earned just barely over minimum wage.[15] If he worked

---

[13]Annual earnings of $25,000 calculates to $480 per week or about $12 per hour for full-time work.

[14]Although plaintiff had no reported earnings after 2003, he testified that he last worked in December 2006 (Tr. at 22).

[15]Plaintiff earned $11,001.82 during 1997. During 2/3 of the year, the federal minimum wage was $4.75. During the other 1/3 of the year, the federal minimum wage was $5.15. Two-thirds of his annual income is $7,334.55. Dividing that by $4.75 results in 1,544 hours. Dividing the remaining annual income ($3,667.27) by $5.15 results in 712 hours for a total of 2,266

full time during 1998, he would have made less than minimum wage.

If he had made only minimum wage in 1999 ($5.15 per hour), he would have worked no more than 25 hours per week all year based on his reported earnings for that year.

If he worked full time in 2000, he would have made right at minimum wage, or $5.15 per hour; 2001 would have been earnings of barely over minimum wage. In 2002 a person working only half time at minimum wage would have earned the same amount reported by plaintiff.

These reported earnings are not typical for someone with a Ph.D. or someone working at a director level job. This factor supports the ALJ's credibility finding as it appears that plaintiff either was not making very much money or was not working very many hours during the last decade and a half before he alleges he became disabled.[16]

Plaintiff argues that the judge should have found credible plaintiff's allegations that he cannot concentrate for more than an hour at a time and that he must rest during the regular work day due to fatigue. Plaintiff testified that his doctors have recommended that he lie down and rest when he has blood sugar

hours. Full-time work is 2,080 hours per year.

[16]This is, of course, assuming that plaintiff reported all of his earned income. If it were the case that he did not, then that fact would also support the ALJ's finding that plaintiff's allegations are not credible.

spikes (Tr. at 30). Contrary to plaintiff's testimony, plaintiff's doctors consistently told him to exercise; and no medical record includes a recommendation by a doctor that plaintiff lie down due to any condition much less due to blood sugar spikes.

On April 11, 2006, plaintiff's doctor encouraged exercise and weight loss (Tr. at 184-188); On July 31, 2006, his doctor encouraged exercise and weight loss (Tr. at 181-183); on September 15, 2006, his doctor noted that plaintiff has "no restriction[s] in activity on account of diabetes that require him to avoid strenuous activity" (Tr. at 169-173); on April 14, 2008, Dr. Mank stressed the importance of exercise and weight loss (Tr. at 213-216); on April 22, 2008, Dr. Lwin noted that plaintiff "is not restricted from strenuous activities" and that he had "no limitations on 'chores' [and] only mild limitations[17] on exercise, no limitations on recreation" (Tr. at 218); on November 17, 2008, Dr. Mank discussed the importance of exercise and weight loss (Tr. at 248-250). There are no medical records wherein plaintiff mentioned a need to lie down and no medical records wherein any medical professional recommended that plaintiff lie down to rest during the day.

---

[17]Dr. Lwin did not identify any restrictions other than plaintiff's alleged difficulty holding a steering wheel due to hand numbness; therefore, it is unclear what these "mild" restrictions were.

Likewise, the medical records do not support plaintiff's allegation of an impaired ability to concentrate. Plaintiff did not mention difficulty concentrating to his doctors. No doctor ever mentioned problems with concentration in any medical record. Every time plaintiff's memory was tested, it was within normal limits for recent and remote events (Tr. at 204-206, 213-216, 220, 243-246, 248-250).

Plaintiff stated that the ALJ was required to discuss plaintiff's daily activities; however, plaintiff did not specifically indicate how any of his daily activities would cast doubt on the ALJ's decision. In the first place, the ALJ is not required to discuss every Polaski factor in his credibility analysis. Casey v. Astrue, 503 F.3d 687, 695 (2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)). And secondly, plaintiff's daily activities do not suggest complete disability. Plaintiff took care of dogs, drove, fixed meals, performed light housework, had no problems with personal care, and used a computer. In addition, plaintiff's doctor called plaintiff's home just three and a half months after plaintiff's alleged onset date and plaintiff was not home (but his wife was). And a little over a month later, plaintiff gave his office number to Dr. Mank as a call-back number. These daily activities and absences from his home during the day do not suggest that

plaintiff is suffering from disabling fatigue and an inability to concentrate as he alleges.

Based on the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's subjective complaints of impaired concentration and a need to lie down and rest during the day are not credible.

## VII. FINDING OF THE VETERAN'S ADMINISTRATION

Plaintiff argues that the ALJ erred in failing to consider the fact that plaintiff was awarded 50% service connected disability by the Veteran's Administration.

The ALJ described plaintiff's disability awards in detail and correctly noted that they were relevant but not binding on his decision. 20 C.F.R. § 404.1504; Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006). The evidence relied upon by the VA did not include any medical records from 1987 through 2007[18] (Tr. at 232-235), and the decision included a notation that plaintiff had "no restriction on your activity".

In plaintiff's Function Report dated September 18, 2007, he was asked to circle any abilities which were effected by his condition (Tr. at 129). He did not circle hearing or using his hands. Tinnitus and mild carpal tunnel syndrome made up 20% of

---

[18]The "evidence" includes treatment records from July 26, 1965, through February 15, 1987, and from January 11, 2007, through November 8, 2007.

his service-related disability.  This suggests that although plaintiff received an award for simply having these conditions, the conditions did not affect his residual functional capacity which is the concern in a Social Security disability case.

Additionally, plaintiff's noncompliance is relevant in a Social Security disability case but was not discussed by the VA. Plaintiff was noted to be noncompliant in April 2006 (Tr. at 184-188), in July 2006 (Tr. at 181-183), in July 2007 (Tr. at 174-175), in August 2007 (Tr. at 173-174), in January 2008 (Tr. at 204-206), and in April 2008 (Tr. at 213-216).  Plaintiff was told for years how important exercise and weight loss were to controlling his diabetes; however, his medical records indicate that he never lost weight, that he hovered around 250 pounds, and that he was even a few pounds heavier in November 2008 than he was two and a half years earlier.  Plaintiff continually (a) stopped taking medication against his doctor's advice, (b) doubled his dosages without checking with his doctor, (c) missed doses of his medication on a regular basis, and (d) failed to see his doctors for follow-up visits as instructed.  When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997).  Failure to follow a prescribed course of remedial

treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

Based on the above, I find that the ALJ adequately considered the opinion of the Veteran's Administration and that the findings of the VA do not contradict the findings of the ALJ in this case.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 8, 2010